Girard Investment Company, Appellant, *v.* Bello.

Argued January 10, 1974. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Otis W. Erisman,* with him *William L. Gaunt, Arthur L. Jenkins, Jr., Truscott and Erisman,* and *Smith, Aker, Grossman, Hollinger and Jenkins,* for aplant.

*Daniel L. Quinlan,* for appellee.

OPINION BY MR. JUSTICE EAGEN, April 23, 1974:

In this action in equity, the chancellor entered an adjudication and decree nisi in favor of the defendants. Exceptions by the plaintiff were dismissed, and the decree nisi was made final. The plaintiff filed this appeal.

The factual background is as follows.

On April 9, 1962, the appellee, Bello, entered into a written contract of employment with the Girard Investment Company [Girard]. This employment contract contained a restrictive employment covenant which states: "13. That for a period of one year after the termination of my employment for any reason I

will not engage in any way, directly or indirectly, in any business competitive with the Employer's business, nor solicit or in any other way or manner work for or assist any competitive business, in any city or the environs or trade territory thereof in which I shall have been located or employed within one year prior to such termination."

On October 6, 1972, Bello terminated his employment with Girard, and on the next day established his own concern, Bell Consumer Discount Company [Bell], with himself president thereof. Bello had been continuously employed from the middle of August 1965 until his cessation of employment, with one brief temporary assignment elsewhere, as branch manager of the Logan Square-Norristown office of Girard.

On November 16, 1972, Girard brought this action in equity to enjoin Bello from continuing his employment in the consumer discount business in Logan Square's "trade territory" and to enjoin Bell from employing Bello in their business. A preliminary injunction hearing followed on December 5, 1972, and the requested preliminary injunction was denied on December 15, 1972. A final hearing was held on January 30, 1973, and on May 29, 1973, the chancellor filed his adjudication and decree nisi. Girard filed exceptions to the chancellor's adjudication, which were heard by the court en banc and eventually dismissed on August 28, 1973.

The chancellor held "that the general covenant not to compete contained in paragraph 13 of the employment contract is not reasonably necessary for the protection of Girard and constitutes an undue hardship on the Defendants [appellees] due to its overly broad geographic limitations."

Restrictive employment covenants (covenants not to compete) are valid only if they are reasonably limited in duration of time, geographic extent and are

"reasonably necessary for the protection of the employer . . . without imposing undue hardship on the employee. . . ." Restatement of Contracts, §516 (f) (1932) ; *Jacobson & Co., Inc. v. International Environment Corp.*, 427 Pa. 439, 452, 235 A. 2d 612, 620 (1967) ; and *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 628, 136 A. 2d 838, 844 (1957). *Accord, Albee Homes, Inc. v. Caddie Homes, Inc.*, 417 Pa. 177, 207 A. 2d 768 (1965). The chancellor determined that the covenant involved was deficient in two respects: (a) it was overly broad in geographic extent; and (b) it constituted unnecessary protection for the employer, while placing an undue burden on the employee. Since, we agree that, under the circumstances, the covenant was not reasonably necessary for the employer's protection, we will affirm the decree.[1]

This Court in *Morgan's Home Equipment Corp. v. Martucci*, supra, announced the standard concerning what is reasonably necessary for an employer's protection. We there stated: "[D]ifferent reasons motivate the upholding of general covenants not to compete which are ancillary to employment. An employe may receive specialized training and skills, and learn the carefully guarded methods of doing business which are the trade secrets of a particular enterprise. To prevent an employe from utilizing such training and information in competition with his former employer, for the patronage of the public at large, restrictive covenants are entered into. They are enforced by the courts as reasonably necessary for the protection of the employer." *Id.* at 631, 136 A. 2d at 846. Also see Restatement of Contracts, §516(f), comment (h) (1932).

Clearly, none of these elements are present in this case; and, furthermore, we are convinced there is no

---

[1] It should be noted that Girard mandated all of its employees, no matter in what capacity they served, to sign the same restrictive covenant here in question.

undue hardship placed upon the employer by the employee's cessation of employment, that would allow it to place such a restriction upon Bello.[2]

Decree affirmed. Each side to bear own costs.

Mr. Chief Justice JONES concurs in the result.

[2] The dissenting opinion of Mr. Justice POMEROY accuses the majority of restricting their consideration of what is reasonably necessary for the protection of the employer to whether there was special training or skills received by the employee from his employer. However, as indicated in the last paragraph of this opinion, we considered the elements mentioned in *Morgan, supra,* as well as *all* other possible reasons for the employer to invoke such a restriction, but were unable to discover any such justification.

DISSENTING OPINION BY MR. JUSTICE POMEROY:

The majority opinion represents a marked departure from established precedent in the area of restrictive covenants. I respectfully dissent.

We all agree that the applicable law is to be found in Chapter 18 of the Restatement of Contracts (1932). The specific question before us, therefore, is whether the covenant of non-competition entered into between Bello and his employer, Girard Investment Co., is a reasonable restraint of trade as defined in Restatement §516(f) : "A bargain by an assistant, servant, or agent not to compete with his employer, or principal, during the term of the employment or agency, or thereafter, within such territory and during such time as may be reasonably necessary for the protection of the employer or principal, without imposing undue hardship on the employee or agent." The majority interprets this section as establishing a three-pronged test of reasonableness : to be enforceable, a covenant must be reasonable in time, in geographical extent, and in relation to the conflicting interests of the parties. While this approach is con-

sistent with some of our recent decisions,[1] I do not think that the test can be broken down in this fashion. Time and space are the dimensions within which a restrictive covenant operates; the reasonableness of a limitation in either dimension must be judged *in terms of* the employer's need for protection and the hardship imposed on the covenanting employee. But my main point of disagreement with the majority concerns not the proper formulation of this test, but its application to the facts of the case at bar. Of course, balancing the conflicting interests of employer and employee may compel the conclusion that no restriction, however narrowly limited in time and space, may be reasonable in a particular case. I cannot agree, however, that we confront such a case today.

The majority holds that an employer is entitled to the benefits of a covenant not to compete only where, during the period of his employment, an employee acquires specialized training and skills, or gains access to methods of doing business which qualify as trade secrets. I agree that there is no evidence in the record that Bello either received specialized training from Girard, or learned any of Girard's confidential business methods. Bello was employed by Girard as the manager of one of its consumer finance branch offices. In addition to general office supervision, his duties comprised making small loans to individual consumers—not an especially esoteric occupation, or one requiring a high level of technical expertise. What Bello did acquire during his years with Girard, according to the record before us, was a number of valuable personal contacts, both with individual loan customers, and, more importantly, with merchants and retailers who,

---

[1] *See, e.g., Bettinger v. Carl Berke Assoc., Inc.,* 455 Pa. 100, 314 A.2d 296 (1974) ; *Hayes v. Altman,* 438 Pa. 451, 266 A.2d 269 (1970).

by referring their customers to particular finance companies, are a crucial source of loan business.

The importance of these contacts to the consumer finance business is documented by the testimony offered by both parties. Girard's president testified that the company required restrictive covenants from its employees because of the "very personal type of business we're in, where the borrowers have a tendency to follow a branch manager and also the sources of business, the very well-spring we get our business from is often developed in a personal way between [sic] a particular branch manager. And it is not uncommon for a branch manager to move from one location to another, where customers within his own company will follow him."[2] Bello himself testified that many of his loan customers were drawn from the circle of his friends and acquaintances. Explaining how loan companies were able to compete with banks, which offer lower interest rates, he remarked: "It's a matter of whether the manager is interested enough to try to make dealer contacts. In our business the majority of the business that you get is through your merchant contacts, and you have to be aggressive and you have to get off your butt and go out and seek the business. It's that simple. And the only way that an individual is going to come to you is through a merchant referral."[3]

It can hardly be doubted that an employee who, by means of his personal contacts, is in a position to divert a substantial amount of business from his employer may present just as serious a competitive threat as a highly trained specialist; the employer's corresponding need for protection may be just as great. On the other side of the coin, a non-specialist such as Bello may suffer much less hardship from a restrictive cov-

[2] Record, 28a-29a.
[3] Record, 108a-109a.

enant than a trained technician would, since the more specialized a man's skills, the more limited may be the job openings available to him in his locality. *See* Restatement, Contracts, §515, comment e. In short, I see nothing in the policy embodied in Restatement §516 to justify restricting covenants of non-competition to employees who have received advanced technical training from their employers. Nor do I think that our own cases support such a limitation.

As authority for its narrowly drawn limitation on restrictive covenants between employer and employee, the Court quotes from *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 631, 136 A.2d 838, 846 (1957) : "[D]ifferent reasons motivate the upholding of general covenants not to compete which are ancillary to employment. An employe may receive specialized training and skills, and learn the carefully guarded methods of doing business which are the trade secrets of a particular enterprise. To prevent an employe from utilizing such training and information in competition with his former employer, for the patronage of the public at large, restrictive covenants are entered into. They are enforced by the courts as reasonably necessary for the protection of the employer." *Supra* at 223.

We glossed this passage from *Morgan* in *Hayes v. Altman*, 424 Pa. 23, 225 A.2d 670 (1967), a case involving a covenant of non-competition between two optometrists. There was no question in *Hayes* that the defendant employee had received all the training necessary to the practice of optometry before he entered the plaintiff's employ. The lower court had held the covenant unenforceable, relying on *Morgan*. Reversing the decree, we said: "It is not necessary that an employee receive specialized training and skills before we will enforce a restrictive covenant. In the *Morgan* case, supra, on page 631, we said an employee

*may* receive specialized training and skills, not that an employee *must* receive specialized training and skills, before the restrictive covenant will be enforced. General covenants not to compete, therefore, are subject to the stringent test of reasonableness as to time and geographical area, and the receiving of special training and skills is just a fact that must be considered and alone is not necessarily controlling." 424 Pa. at 28-29. (Emphasis in original.)

Later that same year, we decided *Jacobson & Co. v. International Environment Corp.*, 427 Pa. 439, 235 A.2d 612 (1967). That case involved a restrictive covenant between a company engaged in the sale of radiant acoustical ceilings, and one of its salesmen, named Kiley, who subsequently established a rival concern. The chancellor found as a fact that Kiley received no special training from Jacobson or insight into its methods of doing business, but nevertheless decreed enforcement of the covenant. We affirmed, citing §516(f) of the Restatement, and saying: "Under the above test, the covenant must stand. The evidence makes clear Jacobson's need for the protection. The radiant heating business is one in which the close personal contact of the sales representative with prospective buyers is crucial to success. As appellee points out in his brief, for a number of years, to the builders, engineers and architects in the area described by the limited covenant, Kiley *was* Jacobson & Co. Both the space and time limitations are proper for Jacobson's protection. . . ." 427 Pa. at 453. (Emphasis in original.) We explicitly rejected the argument that such covenants are enforceable only where an employee receives special training from his employer, quoting the passage from *Hayes* which we have recited above.

Only last January, we decided another case involving a covenant between a salesman and his employer: *Bettinger v. Carl Berke Assoc., Inc.*, 455 Pa. 100, 314

A.2d 296 (1974). Bettinger had hired Berke as a sales manager in the temporary-help division of Bettinger's employment service. Berke subsequently left Bettinger's employ and established his own temporary-help business in violation of the covenant not to compete. Relying on *Jacobson, supra,* we upheld enforcement of the covenant, saying: "Berke [admitted] the crucial importance of customer contact in the business. Bettinger also testified that it was his experience that if close personal relationships were kept with his customers, they would for the most part turn their entire temporary-help needs over to him. Thus, it is reasonable for Bettinger to seek protection from competition from former employees, like Berke, whose sole job was to maintain the close affiliations with prospective employers of temporary help." 455 Pa. at 104, 314 A.2d at 298. The *Bettinger* decision, the most recent pronouncement of our Court in this area, was handed down without dissent.[4] In my view, neither *Bettinger* nor *Jacobson* nor *Hayes* can be reconciled with the result the Court reaches today.

The burden was on Bello to prove the unreasonableness of the covenant which he had entered into and which Girard now seeks to enforce against him. *Jacobson & Co. v. International Environment Corp., supra,* 427 Pa. at 451. Bello failed to carry this burden. As I have noted above, the record clearly shows Girard's need for the protection provided by the covenant. On the other hand, there was no convincing evidence that enforcement of the covenant would impose any undue hardship on Bello. Enforcement would not force Bello to abandon the consumer finance business in the greater Philadelphia area. Girard seeks to restrain Bello's competition only within the trade territory served by

---

[4] All members of the Court joined in the opinion of Mr. Justice O'BRIEN except Mr. Justice MANDERINO, who concurred in the result.

its loan office in Logan Square. Girard produced ample data concerning the geographical distribution of customers served by this office. The chancellor could readily determine from these data what were the reasonable limits of this trade territory. Bello testified that he could solicit business outside the area claimed by Girard as its trade territory, and, indeed, that he had every intention of doing so. I would remand the case to the court below for the framing of a decree enforcing the covenant.